**Slip Op. 05-84**

# UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr><td>

**GERBER FOOD (YUNNAN) CO., LTD. and GREEN FRESH (ZHANGZHOU) CO., LTD.**,

Plaintiffs,

v.

**UNITED STATES**,

Defendant,

and

**COALITION FOR FAIR PRESERVED MUSHROOM TRADE**,

Defendant-Intervenor.

</td><td>

**BEFORE:** Timothy C. Stanceu, Judge

Court No. 03-00544

</td></tr>
</table>

## OPINION AND ORDER

[Final results of antidumping administrative review applying "total adverse facts available" remanded for further proceedings upon plaintiffs' motion for judgment on agency record]

Dated: July 18, 2005

*Garvey Schubert Barer* (*William E. Perry*, *Lizbeth R. Levinson* and *Ronald M. Wisla*) for plaintiffs.

*Peter D. Keisler*, Assistant Attorney General, *Barbara S. Williams*, Attorney-in-Charge, International Trade Field Office, *David M. Cohen*, Director, Commercial Litigation Branch, *Jeanne E. Davidson*, Deputy Director, Commercial Litigation Branch, *Richard P. Schroeder*, Trial Attorney, United States Department of Justice; *Scott D. McBride*, Office of Chief Counsel, United States Department of Commerce, of counsel, for defendant.

*Collier Shannon Scott, PLLC* (*Michael J. Coursey* and *Adam H. Gordon*) for defendant-intervenor.

Stanceu, Judge: Plaintiffs Gerber Food (Yunnan) Co., Ltd. ("Gerber") and Green Fresh

(Zhangzhou) Co., Ltd. ("Green Fresh") challenge certain aspects of a decision issued in July

2003 by the International Trade Administration, U.S. Department of Commerce ("Commerce,"

or the "Department") in an antidumping proceeding. The challenged decision was the

culmination of an administrative review of an order, issued in 1999, imposing antidumping

duties on imports of preserved mushrooms imported from the People's Republic of China

("China" or the "PRC"). *Final Results and Partial Rescission of the New Shipper Review and

Final Results and Partial Rescission of the Third Antidumping Duty Administrative Review for

Certain Preserved Mushrooms From the People's Republic of China*, 68 Fed. Reg. 41,304

(July 11, 2003) ("*Final Results*"). The administrative review pertained to imported preserved

mushrooms from China that were subject to the antidumping duty order and that were entered for

consumption during the period of February 1, 2001 through January 31, 2002 ("period of

review").

Plaintiffs contend that Commerce exceeded its statutory authority, and failed to support

its decision with substantial evidence on the record, in resorting to what Commerce terms "total

adverse facts available" to determine the antidumping duty rate Commerce would assess on

imports of subject mushrooms associated with Gerber and Green Fresh for the period of review.

Relying on statutory provisions allowing it to "use an inference that is adverse to the interests

of" a party that "has failed to cooperate by not acting to the best of its ability to comply with a

request for information" in the review proceeding, Commerce rejected all data relevant to

antidumping duty assessment rates that Gerber and Green Fresh had submitted in response to its

information requests. 19 U.S.C. § 1677e(b) (2000); *see* 19 U.S.C. §§ 1677e(a), 1677m(d)-(e)

(2000). Although it had calculated preliminary antidumping duty assessment rates for Gerber

and Green Fresh of 1.17 percent and 46.61 percent, respectively, Commerce refused to calculate

final antidumping duty assessment rates for Gerber and Green Fresh based on the information

the two companies had submitted, and Commerce had verified, during the administrative review.

Instead, Commerce assigned Gerber and Green Fresh an antidumping duty assessment rate of

198.63 percent, which was the highest rate assigned to any producer or exporter in the

challenged review and the previous administrative review. In addition, this rate was the rate

assigned to producers and exporters who could not establish freedom from control of the

government of the PRC. Commerce applied this rate to Gerber and Green Fresh even though it

previously had found as a fact that both plaintiffs were free of government control.

In the *Final Results*, Commerce gave as a justification for invoking "total adverse facts

available" its finding that Gerber and Green Fresh had made misrepresentations to Commerce in

claiming that Green Fresh, for some of the mushroom shipments to the United States occurring

during the period of review, had acted as Gerber's agent and exporter in return for payment of a

commission. Commerce concluded that Green Fresh's role was largely limited to providing

blank sales invoices to Gerber and, accordingly, that Green Fresh did not have sufficient

involvement in the international sales transactions to justify a claim that it had acted as exporter

of Gerber's merchandise. Commerce further concluded that Green Fresh's participation as an

agent in Gerber's transactions was a means to allow Gerber to circumvent the cash deposit

requirements Commerce had applied to Gerber. Citing to the alleged misrepresentations,

Commerce claimed it was justified in rejecting all the responses of both respondents to its

inquiries during the entire review proceeding.

The court exercises jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(A) (2000) and

28 U.S.C. § 1581(c) (2000). Gerber and Green Fresh participated as respondents in the

administrative review proceeding that resulted in the decision being challenged. Therefore, plaintiffs are "interested parties" within the meaning of 19 U.S.C. § 1677(9)(A) (2000) and, pursuant to 28 U.S.C. § 2631(c) (2000), have standing to challenge the Commerce determination.

The court concludes, for the reasons discussed herein, that Commerce exceeded its statutory authority by rejecting all the data relevant to antidumping duty assessment rates submitted by Gerber and Green Fresh and refusing to calculate specific assessment rates for the two plaintiffs. The court also concludes that certain factual determinations relied upon by Commerce in its invoking of "total adverse facts available" are not supported by substantial evidence. The court remands this matter to Commerce with instructions to conduct further proceedings in conformity with this opinion.

## I. BACKGROUND

### A. Commerce's Initiation of the Third Administrative Review

Commerce issued its antidumping duty order on preserved mushrooms from the PRC in early 1999. *See Notice of Amendment of Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order for Certain Preserved Mushrooms From the People's Republic of China*, 64 Fed. Reg. 8,308 (Feb. 19, 1999). Approximately three years later, the Department announced the opportunity to request the administrative review at issue in this case, which was the third such administrative review of the antidumping duty order. *See Opportunity To Request Administrative Review for Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation*, 67 Fed. Reg. 4,945 (Feb. 1, 2002). Gerber and Green Fresh requested this review on February 28, 2002. On that same day, the petitioner in the antidumping investigation, the

Coalition for Fair Preserved Mushroom Trade, also requested an administrative review, asking

that Commerce review the mushroom import transactions of seven companies, including those of

Gerber and Green Fresh. The Coalition for Fair Preserved Mushroom Trade has defendant-

intervenor status in this proceeding, having satisfied the requirements for intervention set forth

by 28 U.S.C. § 2631(j) and USCIT Rule 24(a). Commerce initiated the administrative review in

response to the requests. *See Initiation of Antidumping and Countervailing Duty Administrative*

*Reviews and Requests for Revocations in Part*, 67 Fed. Reg. 14,696, 14,696-97 (Mar. 27, 2002).

### B. Cash Deposit Rates for Gerber and Green Fresh During the Period of Review

Under the antidumping statute and regulations, importers who enter merchandise that is

within the scope of an antidumping duty order must make a cash deposit of estimated

antidumping duties. *See* 19 U.S.C. § 1673d(c)(1)(B)(ii) (requiring the posting of a cash deposit,

bond, or other security, as Commerce deems appropriate, in the final antidumping determination

Commerce makes in the investigation); 19 C.F.R. § 351.211(b)(2) (requiring cash deposits of

estimated antidumping duties at rates Commerce determined in the final antidumping

determination, once an antidumping order is in effect); *see also* 19 C.F.R. § 351.221(b)(7)

(establishing new cash deposit requirement during an administrative review). Commerce issues

instructions to the Bureau of Customs and Border Protection ("Customs") directing the

collection of the cash deposits. Actual antidumping duties are determined later, upon liquidation

of the entry, which also is performed according to instructions from Commerce to Customs.

Entries of Green Fresh's and Gerber's mushrooms made during the period of review each

were subject to changing cash deposit rates. From the beginning of the period of review on

February 1, 2001 through July 5, 2001, the cash deposit rate in effect for importations of

Gerber's mushrooms was 142.11 percent, the antidumping duty margin established for Gerber in the antidumping investigation concluded in 1999. Gerber's cash deposit rate subsequently was adjusted downward, to 121.33 percent, which was the antidumping duty assessment rate Commerce determined to apply to Gerber's mushrooms that were entered during the period covered by the first administrative review. *See Amended Final Results of First New Shipper Review and First Antidumping Duty Administrative Review for Certain Preserved Mushrooms From the People's Republic of China*, 66 Fed. Reg. 35,595, 35,596 (July 6, 2001). On July 6, 2001, the 121.33 percent rate became the new cash deposit rate for future entries of Gerber's mushrooms, which cash deposit rate remained in effect for the remainder of the period of review, which ended on January 31, 2002. Green Fresh obtained a cash deposit rate of 29.87 percent as a result of its requesting and obtaining a new shipper review. That cash deposit rate went into effect on August 27, 2001. *See Final Results of New Shipper Review for Certain Preserved Mushrooms From the People's Republic of China*, 66 Fed. Reg. 45,006, 45,007 (Aug. 27, 2001).

Gerber's and Green Fresh's cash deposit rates were set forth in instructions that Commerce issued to Customs. The instructions included individual cash deposit rates to be applied based on the identity of specific exporters and producers. In the instructions, Commerce also addressed the situation arising where an entry covered merchandise for which the producer and exporter were different parties, each of which was the subject of an individual cash deposit rate. In that case, Commerce instructed Customs to apply the exporter's cash deposit rate. As of August 27, 2001, Gerber's cash deposit rate for the subject merchandise was 121.33 percent, and Green Fresh's cash deposit rate was 29.87 percent. Thus, as a result of the way that Commerce structured its cash deposit instructions, any mushrooms produced by Gerber but exported by

Green Fresh were subject to a cash deposit rate that was considerably lower than the rate applying if Gerber were both producer and exporter.

 C.  Agreement between Gerber and Green Fresh on Exports of Mushrooms Produced by Gerber

Approximately midway in the period of review, Gerber and Green Fresh entered into an agreement under which Green Fresh would perform services in the role of exporter for mushrooms produced by Gerber.  Under the agreement, which was the subject of a written contract executed in September 2001, Green Fresh agreed to prepare export documents for shipments of mushrooms Gerber produced and to "[a]ct as an agent for [Gerber] to export" its shipments of merchandise to the United States.  *See Second Supplemental Resp. of Gerber Food (Yunnan) Co., Ltd. for Certain Preserved Mushrooms from China, Third Review* (Sept. 12, 2002) (Pub. App. to Pls.' Rule 56.2 Mot. for J. Upon the Agency R. Ex. 7).  In return, Gerber agreed to pay Green Fresh a commission.

Gerber was the producer for a total of 34 shipments of mushrooms exported to the United States during the period of review.  For 24 of those 34 shipments, the entry documentation filed in the United States listed Green Fresh as the exporter, and as a result the cash deposits on those 24 shipments were made at the cash deposit rate applying to Green Fresh, *i.e.*, 29.87 percent, rather than the 121.33 percent rate applying to shipments exported by Gerber.  Of the 24 shipments of Gerber-produced mushrooms for which Green Fresh was listed as the exporter, eleven were made pursuant to the Gerber-Green Fresh agreement discussed above, under which Green Fresh agreed to serve as exporter in an agency relationship.  Green Fresh actually prepared the export documentation on only the first two of the eleven shipments; on the remaining nine shipments Gerber prepared the export-related commercial documentation,

including invoices that it prepared using Green Fresh's blank invoice forms, with Green Fresh's authorization. On the remaining 13 of the 24 shipments of Gerber mushrooms, Green Fresh was listed as the exporter on the entry documentation, including invoices, without Green Fresh's authorization. By that time, Green Fresh had terminated the export agency agreement it had entered into with Gerber.[1] Commerce applied the 198.63 percent assessment rate, in the *Final Results*, to all 34 shipments of Gerber-produced mushrooms made during the period of review.

During the period of review, Green Fresh exported more than 100 shipments of mushrooms produced by an entity other than Gerber, with no participation by Gerber. In the *Final Results*, Commerce applied the 198.63 percent assessment rate to these shipments as well, even though these shipments were not involved in the export agency agreement with which Commerce took issue in its decision.

### D. Commerce's Preliminary Results in the Third Administrative Review

Commerce issued the preliminary results of the administrative review in March 2003. *See Preliminary Results and Partial Rescission of Fourth New Shipper Review and Preliminary Results of Third Antidumping Duty Administrative Review for Certain Preserved Mushrooms*

---

[1] Gerber and Green Fresh disputed the effect of Green Fresh's notice of termination of the export agency agreement. Green Fresh took the position that the contract ended upon its giving notice to Gerber of termination, which occurred in December 2001. Gerber took the position that the effect of the notice of termination was that the contract would not be renewed after its expiration at the end of May 2002. *Verification of the Resp. of Gerber Foods (Yunnan) Co., Ltd. ("Gerber") in the Third Antidumping Duty Administrative Review of Certain Preserved Mushrooms from the People's Republic of China ("PRC")* at 6-7 (Feb. 12, 2003) (Pub. App. to Pls.' Rule 56.2 Mot. for J. Upon the Agency R. Ex. 14); *Verification of the Resp. of Green Fresh Foods (Zhangzhou) Co., Ltd. ("Green Fresh") and Zhangzhou Longhai Lu Bao Food Co., Ltd. ("Lu Bao") the Third Antidumping Duty Administrative Review of Certain Preserved Mushrooms from the People's Republic of China ("PRC")* at 7 (Feb. 12, 2003) (Pub. App. to Pls.' Rule 56.2 Mot. for J. Upon the Agency R. Ex. 13).

*from the People's Republic of China*, 68 Fed. Reg. 10,694 (Mar. 6, 2003) ("*Preliminary*

*Results*").  In the *Preliminary Results*, Commerce reported its calculated preliminary

antidumping duty assessment rates for both respondents.  The preliminary antidumping duty

assessment rate for Gerber was calculated to be 1.17 percent; for Green Fresh the rate was

calculated to be 46.61 percent.  *See id.* at 10,702.  In the *Preliminary Results,* Commerce

indicated its disapproval of the agreement between Gerber and Green Fresh under which Green

Fresh was to act as exporter of record for Gerber's merchandise.  Commerce proposed to act on

its disapproval by departing from its normal practice, under which the cash deposit rate for future

entries would have been set at the individual assessment rate for each individual respondent.

Instead, Commerce proposed to assign both companies the rate of 46.61 percent as a cash deposit

rate for future entries.  *See id.*  Thus, the action would not have changed the cash deposit rate for

Green Fresh but would have had as its effect the setting of Gerber's cash deposit rate at 46.61

percent instead of the 1.17 percent cash deposit rate that Commerce ordinarily would have

established.

The Coalition for Preserved Mushroom Trade, the petitioner in the original antidumping

investigation, criticized as too lenient the way Commerce, in the *Preliminary Results*, had

proposed to address the export agency arrangement between Gerber and Green Fresh.  In its case

brief, filed with Commerce on May 1, 2003, the petitioner argued that Commerce should invoke

"total adverse facts available" against both Gerber and Green Fresh by applying to both

respondents the highest possible antidumping duty assessment rate for the period of review.

Petitioners argued that Commerce's invoking "total adverse facts available" to this degree would

be the appropriate response to what petitioners viewed as serious wrongdoing by the two respondents.[2]

The following July, Commerce issued the final decision that plaintiffs challenge in this litigation. *See Final Results*, 68 Fed. Reg. at 41,304. In the *Final Results*, Commerce, after holding an *ex parte* meeting with petitioner and a subsequent, separate *ex parte* meeting with respondents, took the harshest course of action urged by the petitioner, assessing antidumping duties of 198.63 percent upon all entries of the subject merchandise of both respondents made during the period of review. *See id.* at 41,309.

### E.  Commerce's *Final Results* in the Third Administrative Review

In the *Final Results*, Commerce made several findings of fact, disputed by plaintiffs, the common thread of which is that Commerce disbelieved that Green Fresh actually acted as the exporter for shipments of Gerber's mushrooms to the United States. Commerce based its severe action against Gerber and Green Fresh on its finding that "both companies withheld crucial information prior to verification and actively colluded to circumvent the cash deposit rates in effect during the [period of review] . . . [such that] the use of total adverse facts available is warranted in this case with respect to determining Gerber's and Green Fresh's cash deposit and assessment rates. . . ." *Id.* at 41,306. Commerce found as a fact that "Gerber continually

---

[2] Petitioner also proposed several less stringent measures to be applied to the two respondents for use in the event Commerce rejected petitioner's proposal for "total adverse facts available." Among them was a proposal that both respondents be subjected to an assessment rate equal to the cash deposit rate of 121.33 percent assigned to Gerber in the first administrative review. *Issues and Decision Memorandum for the Final Results of the Antidumping Duty New Shipper and Administrative Reviews on Certain Preserved Mushrooms from the People's Republic of China - February 1, 2001, through January 31, 2002* at 5-6 (Pub. App. to Def.'s Mem. in Opp'n to Pls.' Rule 56.2 Mot. for J. Upon the Agency R. Ex. B).

misrepresented in its questionnaire responses the true nature of its relationship with Green Fresh during the [period of review]." *Id*. Commerce concluded that "Gerber's misrepresentations were highly material to the Department's analysis and call into question the veracity of other responses provided by Gerber." *Id*. "Because the Department relies on original sales invoices to verify the accuracy of the sales listing, the information Gerber mis-characterized and withheld was fundamental and material to the Department's analysis. Gerber's actions now lead [Commerce] to question [its] verification findings which were predicated on the reliability of Gerber's own information and records." *Id.* at 41,307.

Commerce drew similar conclusions about Green Fresh. "With respect to Green Fresh, its representations on the record significantly impeded this proceeding as well." *Id*. According to Commerce, Green Fresh had been a willing participant in the "misrepresentation" in that it had claimed to have been Gerber's agent. Commerce concluded that "Green Fresh never acted as Gerber's agent for most of the Gerber/Green Fresh reported transactions." *Id.* at 41,306. Commerce reasoned that "the willingness of Green Fresh to assist another company to evade the payment of legally required cash deposits, as well as its consistent mis-characterization of the facts on the record (despite its representatives' certification of the facts contained in multiple submissions to the Department as truthful when they were not), leads [Commerce] to again question the validity of the books and records examined by the Department at verification." *Id.* at 41,307.

### F.  Principal Contentions of the Parties

Plaintiffs argue that Commerce's decision to apply the 198.63 percent rate to Gerber and Green Fresh was unsupported by substantial evidence on the record and otherwise not in

accordance with law.  They assert that substantial evidence did not support Commerce's

invoking of the "facts otherwise available" procedure of 19 U.S.C. § 1677e(a) and that therefore,

by definition, Commerce did not have the authority to invoke the "adverse inferences" procedure

of 19 U.S.C. § 1677e(b).  According to their argument, Gerber and Green Fresh responded to all

questionnaires, timely produced all required documentation, and replied to the best of their

ability to Commerce's questions about their business relationship as it pertained to the export

agency agreement.  Plaintiffs characterize the administrative record as containing verified

information on U.S. sale prices, moving expenses, proof of payment, factors of production, and

all other subjects that is sufficient to allow the Department to calculate individual antidumping

margins for both respondents.  Rather than a legitimate resort to the "facts otherwise available"

and "adverse inferences" procedures in the statute, the Commerce action was, in their view, an

unlawful attempt to punish Gerber and Green Fresh for the way in which the two respondents

structured their business relationship.

Defendant and defendant-intervenor maintain that Commerce was justified in imposing

the 198.63 percent rate because Commerce found, based on substantial evidence, that Gerber and

Green Fresh misrepresented the facts concerning the export agency agreement, particularly in

stating that Green Fresh acted as an export agent for Gerber's shipments of mushrooms to the

United States.  They contend that Gerber's and Green Fresh's responses to Commerce's requests

for information concerning that agreement reveal that both plaintiffs withheld information and

significantly impeded the antidumping proceeding.  Those responses justified, in their view,

Commerce's determination that none of the information that the two respondents submitted

during the entire investigation could be verified.  Based on these findings, defendant and

defendant-intervenor argue that the criteria for invoking the "facts otherwise available" procedure of 19 U.S.C. § 1677e(a) were met and further argue that Gerber and Green Fresh did not cooperate to the best of their ability in responding to Commerce's requests for information, thus justifying the invoking of "adverse inferences" pursuant to 19 U.S.C. § 1677e(b). They also argue that Commerce's construction of § 1677e(a) and (b) is entitled to deference under the Supreme Court's decision in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Defendant and defendant-intervenor submit, additionally, that the imposition of the 198.63 percent rate was appropriate as an exercise of Commerce's inherent authority to respond to circumvention of the antidumping duty laws.

## II. STANDARD OF REVIEW

This court must evaluate whether the challenged findings by the Department are supported by substantial evidence on the record or are otherwise in accordance with law. *See* 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

## III. DISCUSSION

This case presents the issue of whether Commerce acted in accordance with law in applying the 198.63 percent rate to the shipments of Gerber and Green Fresh for antidumping duty assessment purposes. The court concludes that Commerce failed to support, with substantial evidence on the record, certain findings of fact in the challenged decision. Because these findings were required for the application of the "facts otherwise available" and "adverse inferences" provisions set forth in 19 U.S.C. § 1677e, the challenged decision exceeded the

authority granted by Congress in those provisions.  The court further concludes that the *Final Results*, in assigning the 198.63 percent antidumping duty assessment rate to the plaintiffs, cannot be justified by deference to an agency construction of § 1677e, nor can it be justified by deference to a construction of the antidumping laws in general under which Commerce may exercise its "inherent" authority to prevent circumvention of those laws.

In the *Final Results*, Commerce rejected the applicable data pertaining to the calculation of individual assessment rates that Gerber and Green Fresh submitted in response to its questionnaires, and declined to calculate individual antidumping duty assessment rates for Gerber and Green Fresh, even though Commerce had verified those data prior to using them to calculate preliminary antidumping duty assessment rates in the *Preliminary Results*.  Instead, Commerce applied both "facts otherwise available" under subsection (a) of § 1677e and "adverse inferences" under subsection (b) of § 1677e, an application that Commerce characterized as "total adverse facts available."  Relying on these provisions, Commerce applied an antidumping duty assessment rate of 198.63 percent to both plaintiffs for all entries of mushrooms produced by Gerber or exported by Green Fresh during the period of review.  It also established this rate as the new cash deposit rate for future entries, which action plaintiffs also challenge.

Had Commerce adopted in the *Final Results* the antidumping duty assessment rates it had calculated in the *Preliminary Results*, Gerber's assessment rate would have been 1.17 percent and Green Fresh's rate would have been 46.61 percent.  The assessment rates in the *Preliminary Results* were intended by Commerce to reflect the amount by which "normal value," as determined for goods of a non-market economy country, exceeded the U.S. prices associated with the sales of Gerber's and Green Fresh's subject merchandise during the period of review.

As discussed below, Commerce in the *Final Results* did not adopt the 198.63 percent assessment rate with that intent, adopting it instead in response to its disapproval of the export agency agreement entered into by Gerber and Green Fresh and the way the parties reported that agreement in the responses to the Department's questionnaires. Commerce, however, failed to support with substantial evidence on the record the findings of fact on which it relied in invoking § 1677e. The court reaches this conclusion for two reasons.

The first reason for the court's conclusion is the lack of substantial evidence on the record to support Commerce's apparent finding that the information submitted by both plaintiffs did not qualify for use in calculating actual assessment rates. Commerce apparently rejected all of that information based on findings of fact under 19 U.S.C. § 1677e(a)(2) and § 1677m(e) that neither the information submitted by Gerber, nor the information submitted by Green Fresh, contained in questionnaire responses and necessary to determining actual assessment rates, could be "verified." However, a finding that the information is not verifiable is unsupported by substantial evidence. In fact, the record reveals that Commerce itself had verified both sets of information and used them in calculating the separate assessment rates for Gerber and Green Fresh that it reported in the *Preliminary Results*.

The second reason for the court's conclusion is that Commerce erred in applying 19 U.S.C. § 1677e(b) by determining that the PRC-wide assessment rate should apply as "adverse facts available" and by failing to support that determination with substantial evidence on the record. There is a complete absence of evidentiary support for the specific choice of the 198.63 percent rate, which is the rate Commerce applied in the subject review, and the previous review, to respondents who failed to demonstrate independence from control of the government

of the PRC. The record lacks any evidence that either Gerber or Green Fresh is subject to PRC control; moreover, Commerce made findings of fact in the *Preliminary Results*, which it did not subsequently reverse or modify, that both plaintiffs were *not* subject to PRC control.

Absent the substantial evidence necessary to support the findings that Commerce made pursuant to 19 U.S.C. § 1677e, Commerce's determination of the 198.63 percent assessment rate on the basis of "total adverse facts available" exceeded the authority Congress provided in 19 U.S.C. § 1677e. To explain its conclusion that Commerce erred in determining that the PRC-wide rate of 198.63 percent was the appropriate assessment rate for Gerber and Green Fresh, the court, in the discussion below, (A) examines how Commerce incorrectly applied subsection (a) of § 1677e in conjunction with subsection (e) of § 1677m by disregarding verified information relevant to calculating individual assessment rates and by failing to base its findings on substantial evidence on the record, (B) analyzes how Commerce erred in applying subsection (b) of § 1677e by determining that the PRC-wide assessment rate should apply as "adverse facts available" and by failing to support its determination with substantial evidence on the record, and (C) explains why Commerce's determination is not justified by deference to Commerce's construction of either 19 U.S.C. § 1677e or the antidumping laws in general, which Commerce insists permit it to exercise its "inherent authority" to prevent circumvention of those laws.

### A. Commerce Erred in Applying 19 U.S.C. § 1677e(a) by Disregarding Verified, Company-Specific Information for Gerber and Green Fresh Without Basing its Decision on Substantial Evidence on the Record

Commerce erred in applying 19 U.S.C. § 1677e(a) by invoking the "facts otherwise available" procedure when Commerce possessed verified, company-specific information from which to determine the assessment rates for Gerber and Green Fresh. Subsection (a) of § 1677e

allows Commerce to invoke "facts otherwise available" when "necessary information is not

available on the record" or when any of four conditions specified in subparagraph (a)(2) is met.

The four conditions apply to situations where a party:

> (A) withholds information that has been requested by the administering
> authority . . . under this subtitle, . . .
> (B) fails to provide such information by the deadlines for submission of the
> information or in the form and manner requested, subject to subsections (c)(1) and
> (e) of section 1677m of this title,
> (C) significantly impedes a proceeding under this subtitle,
> or
> (D) provides such information but the information cannot be verified as
> provided in section 1677m(i) of this title.

19 U.S.C. § 1677e(a)(2). Where a party meets any of these four conditions, the statute provides

that Commerce shall, subject to § 1677m(d), "use the facts otherwise available in reaching the

applicable determination." 19 U.S.C. § 1677e(a). In the *Final Results*, Commerce concluded

that the plaintiffs' reporting of the export agency agreement satisfied conditions (A), regarding

the withholding of information, (C), concerning significantly impeding a proceeding, and (D),

with respect to information that was provided but cannot be verified. *See Final Results*, 68 Fed.

Reg. at 41,307.

In subjecting the use of "facts otherwise available" to 19 U.S.C. § 1677m(d), the statute

applies a procedure when Commerce determines that a response to a request for information

does not comply with the request. In sum, subsection (d) of § 1677m requires that Commerce

promptly inform the submitter of the nature of the deficiency and, "to the extent practicable,

provide that person with an opportunity to remedy or explain the deficiency in light of the time

limits established for the completion of investigations or reviews under this subtitle." 19 U.S.C.

§ 1677m(d). If Commerce determines that the response of the submitter is not satisfactory, or if

such response is not timely, Commerce then "may, subject to subsection (e) of [§ 1677m], disregard all or part of the original and subsequent responses." *Id.*

When applying subsection (a) of § 1677e, Commerce, pursuant to subsection (d) of § 1677m, must comply with the requirements of § 1677m(e). Accordingly, Commerce must determine whether information is "necessary to the determination" and whether that particular information must be considered even if Commerce concludes that such information does not meet all of its requirements. *See* 19 U.S.C. § 1677m(e) (providing that in reaching administrative review determinations under § 1675, among other determinations, Commerce "shall not decline to consider information that is submitted by an interested party and is necessary to the determination but does not meet all the applicable requirements established by [Commerce]"). The statute provides five criteria, which, if met, preclude Commerce from declining to consider submitted information: (1) the information must be submitted by the deadline; (2) the information must be verifiable; (3) the information must not be "so incomplete that it cannot serve as a reliable basis for reaching the applicable determination"; (4) "the interested party [must] demonstrate[] that it acted to the best of its ability in providing the information and meeting the requirements established by [Commerce] with respect to the information"; and (5) the information must be such that it "can be used without undue difficulties." 19 U.S.C. § 1677m(e).

In the *Final Results*, Commerce does not explain adequately why the five criteria in 19 U.S.C. § 1677m(e) are not satisfied by Gerber's and Green Fresh's submission of the subsequently-verified information that was necessary to the calculation of individual assessment

rates. Nor does Commerce explain which of its specific "applicable requirements," as referenced in § 1677m(e), were not satisfied by this information.

Commerce regarded as not verifiable the information that Gerber and Green Fresh had submitted during the review and that was necessary to the calculation of individual assessment rates. Commerce concluded that the export agency agreement and the misleading responses or misrepresentations it alleges to have been made by both plaintiffs concerning that agreement caused it to question the veracity of all other information submitted by the parties in the review proceeding:

> For purposes of the [*Final Results*], [the Department] now find[s] that Gerber and Green Fresh's joint efforts during the [period of review] to illegally evade antidumping duty cash deposits and subsequent misleading responses to the Department's questionnaires, illustrate a pattern of behavior intended to undermine the antidumping duty law and the ability of the Department to enforce it. Such behavior calls into question the validity of all of the information provided to the Department in the questionnaire responses and leads the Department to question both parties' business practices and the veracity and commercial validity of Gerber['s] and Green Fresh's reported information.

*Issues and Decision Memorandum for the Final Results of the Antidumping Duty New Shipper and Administrative Reviews on Certain Preserved Mushrooms from the People's Republic of China - February 1, 2001, through January 31, 2002* at 9 ("*Decision Memorandum*") (Pub. App. to Def.'s Mem. in Opp'n to Pls.' Rule 56.2 Mot. for J. Upon the Agency R. Ex. B).

The rationale that Commerce put forth does not justify Commerce's dispensing with the requirements of 19 U.S.C. § 1677m(e). The record evidence concerning the "misrepresentations" alleged to have been made by Gerber and Green Fresh is not sufficient to support a conclusion that none of the submitted information pertaining to the calculation of actual assessment rates – information that was separate from the information the two parties

reported concerning the export agency agreement – was "verifiable" for purposes of 19 U.S.C. § 1677m(e)(2) and § 1677e(a)(2)(D).  Based on the record evidence, Commerce indicated that Gerber and Green Fresh misrepresented the nature of their export agency agreement in several ways: (1) the use of certain terms in the export agency agreement that Commerce considered to imply a more active role for Green Fresh than Commerce believes Green Fresh to have assumed; (2) the alleged misrepresentation by Gerber and Green Fresh regarding their motive for entering into the export agency agreement; (3) the alleged failure of both parties to disclose initially the fact that they did not adhere to the original terms of the export agency agreement; and (4) the alleged failure of Green Fresh to provide supporting documentation for shipments that Gerber made using Green Fresh's invoices.  *Decision Memorandum* at 10-13.  This record evidence of "material misrepresentations" uniquely concerns the terms and execution of the export agency agreement between Gerber and Green Fresh.  *See id.* at 10, 12.  Although Commerce could demonstrate, with record evidence, that one or both of the parties were less than forthcoming regarding certain aspects of the export agency agreement, this record evidence is not sufficient to impugn the veracity of all other record evidence, *i.e.*, record evidence that Commerce used to calculate the assessment rates in the *Preliminary Results*.

Commerce never explained adequately why the other record evidence was not "verifiable."  Instead, Commerce offered vague assertions, insisting that it "must have confidence that transactions reviewed at verification are legitimate with no mis-characterization or mislabeling of the information being verified" and added the general notion that "[t]he verification process is highly dependent upon the accurate and comprehensive characterization by respondents of the facts supporting their books and records, and the information contained

therein." *Decision Memorandum* at 9. With respect to Gerber, Commerce then concluded that Gerber is untrustworthy and hence that Commerce cannot treat its findings at verification as accurate. *See id*. at 11. Commerce drew a similar conclusion with respect to Green Fresh; Commerce concluded that it could not rely on any of the information that Green Fresh provided because the misrepresentations it alleged regarding the export agency agreement led Commerce to question the validity of all the information reviewed at verification. *See id*. at 13-14.

At verification, however, other than the record evidence regarding the export agency agreement, Commerce found few discrepancies with the information that Gerber and Green Fresh provided, and Commerce resolved any inaccuracies found during verification. *See Verification of the Resp. of Gerber Foods (Yunnan) Co., Ltd. ("Gerber") in the Third Antidumping Duty Administrative Review of Certain Preserved Mushrooms from the People's Republic of China ("PRC")* (Feb. 12, 2003) (*"Gerber Verification Report"*) (Pub. App. to Pls.' Rule 56.2 Mot. for J. Upon the Agency R. Ex. 14); *Verification of the Resp. of Green Fresh Foods (Zhangzhou) Co., Ltd. ("Green Fresh") and Zhangzhou Longhai Lu Bao Food Co., Ltd. ("Lu Bao") the Third Antidumping Duty Administrative Review of Certain Preserved Mushrooms from the People's Republic of China ("PRC")* (Feb. 12, 2003) (*"Green Fresh Verification Report"*) (Pub. App. to Pls.' Rule 56.2 Mot. for J. Upon the Agency R. Ex. 13). Even after noting the alleged misrepresentations concerning the export agency agreement that were discovered at verification, Commerce declined to use "facts otherwise available" and "adverse inferences" when calculating preliminary individual assessment rates and acknowledged that "for assessment purposes, [the Department] verified that the sales data reported by each respondent was accurate and, for purposes of this review, can calculate

importer-specific assessment rates using this data." *Memorandum from Louis Apple, Director, Office of AD/CVD Enforcement 2, to Susan Kuhbach, Acting Deputy Assistant Secretary for Import Administration* at 6 (Feb. 28, 2003) (discussing the appropriate cash deposit rates and the calculation of individual assessment rates for Gerber and Green Fresh given the findings regarding the export agency agreement) ("*Cash Deposit Memorandum*") (Pub. App. to Def.-Intervenor's Mem. in Resp. to Pls.' Rule 56.2 Mot. for J. Upon the Agency R. Ex. 24); *see Preliminary Results*, 68 Fed. Reg. at 10,697.  Having made such favorable findings concerning the accuracy and suitability of the submitted information needed to calculate assessment rates, and having failed to support with substantial evidence any later findings to the contrary, Commerce may not refuse to consider that information.  Commerce cannot maintain plausibly that, for purposes of § 1677m(e)(2), the information cannot be verified or that, for purposes of § 1677m(e)(4), Gerber and Green Fresh failed to demonstrate that they acted to the best of their ability in providing the information and meeting Commerce's requirements.

As the Court of Appeals for the Federal Circuit has observed, the use of facts otherwise available is to "fill in the gaps" when "Commerce has received less than the full and complete facts needed to make a determination." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1381 (Fed. Cir. 2003).  Legislative history illustrates that Commerce's action in the *Final Results* is based on an impermissible use of the authority under 19 U.S.C. § 1677e.  The language of § 1677e was included in the Uruguay Round Agreements Act of 1994, Pub. L. No. 103-465, 108 Stat. 4809 (1994).  The Statement of Administrative Action explains that subsection (a) of § 1677e pertains to situations "where requested information is missing from the record or cannot be used because, for example, it has not been provided, it was provided late, or Commerce could

not verify the information." *Uruguay Round Agreements Act, Statement of Administrative Action*, H.R. Doc. No. 103-316, at 869 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 4040, 4198 ("*SAA*").

As Commerce demonstrated in the *Preliminary Results*, it had sufficiently full and complete facts, which Commerce itself had verified, to find that Gerber and Green Fresh were free from PRC-control and to determine the preliminary antidumping assessment rates to be 1.17 percent for Gerber and 46.41 percent for Green Fresh. *See Preliminary Results*, 68 Fed. Reg. at 10,702. The subsequent refusal by Commerce to use the verified sales data was based solely on its disapproval of the export agency relationship and the way in which the two plaintiffs reported that relationship. *See Final Results*, 68 Fed. Reg. at 41,306-07. However, the facts on record pertaining to the export agency relationship do not support a conclusion that the verified information provided by both respondents could not be used to calculate separate assessment rates. Commerce never identified any gaps or deficiencies in that information such as would preclude Commerce from relying on that information for the purpose of calculating assessment rates. Nor did Commerce identify any inaccuracy, mis-characterization, or discrepancy in the information to support a conclusion that the information is no longer "verifiable."

Viewed against the "substantial evidence" requirement as defined in *Consolidated Edison Co.*, 305 U.S. at 229, the record evidence in this case is not such as "a reasonable mind might accept as adequate to support a conclusion" that none of the information submitted by either Gerber or Green Fresh in the third administrative review could be verified for use in calculating individual assessment rates. Because Commerce failed to justify its rejection of that information

under the requirements of 19 U.S.C. § 1677m(e), Commerce's rationale for invoking the "facts otherwise available" procedure of 19 U.S.C. § 1677e(a) is insufficient.

In addition to the criterion for invoking "facts otherwise available" that is set forth in § 1677e(a)(2)(D), which is satisfied only if an interested party provides necessary information that "cannot be verified," Commerce also invoked criteria (A) and (C) of § 1677e(a)(2), which are satisfied if the party "withholds information" that Commerce requested, or "significantly impedes a proceeding," respectively. Neither criterion (A) nor criterion (C), however, justifies Commerce's actions in the *Final Results*. Commerce made findings that Gerber and Green Fresh initially withheld information by misrepresenting the nature of the export agency agreement and that these misrepresentations impeded a proper review of the transactions affected by the export agency agreement. *See Decision Memorandum* at 11, 13. Even assuming, *arguendo*, that the two parties initially withheld some information about the export agency agreement, none of the information allegedly withheld was necessary to the calculation of individual antidumping duty assessment rates. Because Commerce did not satisfy the requirements of 19 U.S.C. § 1677m(e) as to the information that actually was necessary to the calculation of individual assessment rates, Commerce's invoking of criterion (A) of § 1677e(a)(2) is insufficient to justify the actions taken in the *Final Results*. With respect to criterion (C) of § 1677e(a)(2), Commerce did not reveal its reasoning and failed to cite to evidence on the record that could support a finding that the administrative review proceeding was "significantly impeded" as a result of actions taken by either Gerber or Green Fresh.

B.  Commerce Erred in Its Applying 19 U.S.C. § 1677e(b) by Determining that the PRC-Wide Assessment Rate Should Apply as "Adverse Facts Available" and by Failing to Support its Determination with Substantial Evidence on the Record

Commerce erred further in its applying subsection (b) of § 1677e.  If Commerce makes the findings, based on substantial record evidence, that are required for invoking subsection (b) of 19 U.S.C. § 1677e, it may "use an inference that is adverse to the interests of that party [(*i.e.*, the party that failed to cooperate by not acting to the best of its ability to comply with a request by Commerce for information)] *in selecting from among the facts otherwise available*." 19 U.S.C. § 1677e(b) (emphasis added).  In selecting from among "facts otherwise available," Commerce can rely on information derived from "the petition," "a final determination in the investigation under this subtitle," "any previous review under 19 U.S.C. § 1675 or determination under 19 U.S.C. § 1675b," or "any other information placed on the record."  19 U.S.C. § 1677e(b).

Subsection (b) of § 1677e cannot properly be read in isolation.  In limiting the procedure thereunder to the agency's "selecting from among the facts otherwise available," subsection (b) refers back to subsection (a).  Therefore, if it is assumed, *arguendo*, that subsection (b) is available to be invoked against Gerber and Green Fresh based on each party's failure to respond to the best of its ability to Commerce's requests for information concerning the nature of the export agency agreement, Commerce, in determining assessment rates, nevertheless is confined by subsection (b) to "selecting from among the facts otherwise available."  Commerce did not so confine its action.

In the *Preliminary Results*, Commerce made findings of fact based on substantial evidence that both Gerber and Green Fresh were independent of control of the government of the PRC.  *See Preliminary Results*, 68 Fed. Reg. at 10,698-99.  Gerber was deemed to be

independent of government control because it "is wholly owned by persons located outside the

PRC." *Id*. at 10,698. As to Green Fresh, Commerce determined in the *Preliminary Results* that

Green Fresh has demonstrated absence of both *de jure* and *de facto* government control. *See id.*

at 10,698-99. Commerce reported no findings of fact in the *Final Results* that contradicted or

cast doubt on its earlier findings related to the matter of government control of either plaintiff.

On the basis of those findings, and consistent with its past practice, Commerce proceeded

to calculate separate preliminary antidumping duty assessment rates: 1.17 percent for Gerber and

46.61 percent for Green Fresh. While Commerce, in the *Preliminary Results*, took exception to

the way the export agency agreement was reported, Commerce did not invoke its "total adverse

facts available" procedure, which encompasses both subsection (a) ("facts otherwise available")

and subsection (b) ("adverse inferences"), on the calculation of the assessment rates, instead

invoking that procedure to set a higher-than-normal cash deposit rate for future entries of

Gerber's merchandise.[3] *See Preliminary Results*, 68 Fed. Reg. at 10,702. Commerce explained

that "for assessment purposes, [the Department] verified that the sales data reported by each

respondent was accurate and, for purposes of this review, can calculate importer-specific

assessment rates using this data . . . . Therefore, *[the Department] do[es] not believe the use of*

*adverse facts available* . . . for each of these respondents *is warranted*." *Cash Deposit*

*Memorandum* at 6 (emphasis added).

In the *Final Results*, however, Commerce invoked the "total adverse facts available"

procedure to disregard all data relevant to calculation of actual assessment rates that either party

---

[3] Neither the statute nor Commerce's regulations refer to the procedure Commerce identifies as "total adverse facts available." The statute sets forth two individual, but related, procedures in subsections (a) and (b) of 19 U.S.C. § 1677e.

had submitted. Pursuant to its application of its "total adverse facts available" procedure, Commerce offered the unsupported and conclusory statement that "as adverse facts available, in light of record evidence of material misrepresentations by Gerber as noted above and the potential for future misconduct, the assignment of a cash deposit and assessment rate equal to the PRC-wide rate of 198.63 percent is appropriate." *Decision Memorandum* at 11. Commerce reached the same conclusion for Green Fresh. *See Decision Memorandum* at 13-14. Instead of selecting, and identifying in its decision, facts that were "otherwise available" for use in determining assessment rates, Commerce saddled Gerber and Green Fresh with a punishing assessment rate that was hugely disproportionate to the individual assessment rates it had calculated in the *Preliminary Results*.

But an assessment rate, standing alone, is not a "fact" or a set of "facts otherwise available," and under no reasonable construction of the provision could it be so interpreted. The statute does not permit Commerce to choose an antidumping duty assessment rate as an "adverse inference" without making factual findings, supported by substantial evidence, justifying a conclusion that the body of record information necessary to the calculation of that assessment rate is to be rejected for reasons consistent with the statutory scheme, including in particular § 1677e(b) when read in conjunction with § 1677e(a) and § 1677m(e).

As the Court of Appeals for the Federal Circuit observed, Commerce does not have the discretion under 19 U.S.C. § 1677e(b) to impose an "unjustifiably high, punitive rate" that ignores the facts discovered in the course of its own investigation. *F.lli De Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1033 (Fed. Cir. 2000) ("*De Cecco*"). Although Commerce has considerable discretion in making antidumping determinations and in applying 19 U.S.C. § 1677e(b), that discretion is not boundless. *See De Cecco*, 216 F.3d at 1034

("By requiring corroboration of adverse inference rates, Congress clearly intended that such rates should be reasonable and have some basis in reality.").[4] Commerce exceeds its discretion if it imposes an "unjustifiably high, punitive rate" that is contrary to its own findings of fact. *See id.* at 1033. The Court of Appeals for the Federal Circuit reiterated these principles in a decision issued in 2002:

> Congress could not have intended for Commerce's discretion to include the ability to select unreasonably high rates with no relationship to the respondent's actual dumping margin. Obviously a higher adverse margin creates a strong deterrent, but Congress tempered deterrent value with the corroboration requirement. It could only have done so to prevent the petition rate (or other adverse inference rate), when unreasonable, from prevailing and to block any temptation by Commerce to overreach reality in seeking to maximize deterrence.

*Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1340 (Fed. Cir. 2002) (quoting *De Cecco*, 216 F.3d at 1032).

Instead of calculating an assessment rate for Gerber based on record information, Commerce instead took an action that was intended, at least in part, as a punishment of Gerber, stating in the *Decision Memorandum* that "[t]he Department cannot tolerate the existence of schemes to evade the antidumping law, such as the one applied by Gerber in this case" and that "[t]he Department considers the assignment of this rate to Gerber sufficient to encourage it to cooperate with the Department in further reviews, and to ensure that Gerber cannot undermine the efficacy of the antidumping law by posting insufficient and improper deposits." *Decision Memorandum* at 11.

---

[4] Subsection (c) of § 1677e requires that Commerce, "to the extent practicable," corroborate from independent sources reasonably at its disposal "secondary information" that it relied upon and that was not obtained in the course of an investigation or review. 19 U.S.C. § 1677e(c).

Commerce's statements concerning Green Fresh also reveal the intent to inflict punishment on a respondent. Commerce stated that "[it] considers the assignment of this rate to Green Fresh as sufficient to encourage it to cooperate with the Department in future reviews, and to ensure that Green Fresh does not participate in other schemes to evade the antidumping duty law and payment of appropriate cash deposit rates in the future." *Id.* at 14. The punitive intent of Commerce's action is also apparent because, as noted previously, Commerce in the subject third administrative review applied the 198.63 percent PRC-wide rate to more than 100 shipments of mushrooms exported by Green Fresh and produced by an entity other than Gerber, even though Gerber had no involvement in these shipments. Commerce failed to provide a rational explanation of how Green Fresh's participation in the export agency agreement, and the circumstances surrounding its reporting of that agreement, affected the unrelated information needed to calculate an antidumping duty rate for application to all shipments by Green Fresh of mushrooms subject to the administrative review.

Consistent with the Federal Circuit's instruction that an assessment rate calculated using adverse inferences have some basis in reality, this Court has held that Commerce acts unlawfully in imposing a rate that presumes government control, such as the PRC-wide rate applied in this case, when a respondent has been found to be independent of government control. *See Shandong Huarong Gen. Group Corp. v. United States*, No. 01-00858, 2003 Ct. Intl. Trade LEXIS 153, at *61-*66 (Oct. 22, 2003), *subsequently remanded by Shandong Huarong Gen. Group Corp. v. United States*, 2004 Ct. Intl. Trade LEXIS 121 (Sept. 13, 2004). The Court in *Shandong Huarong* found that "the findings that justified the use of facts available and a resort to adverse facts available with respect to the [respondents'] sales data and factors of production, cannot be used to accord similar treatment to issues relating to the [respondents'] evidence of

independence from state control." *Id.* at \*62. As the Court in *Shandong Huarong* explained with regard to the respondents' independence from government control, "[t]he [respondents] supplied the requested information and Commerce has not adequately demonstrated a sufficient reason to disregard the [respondents'] submissions of evidence of their entitlement to separate antidumping duty margins and resort to adverse facts available." *Id.* at \*66.

The reasoning in *Shandong Huarong* is pertinent to the issue presented in this case by Commerce's choice of the 198.63 percent PRC-wide assessment rate. Commerce took issue with the way in which the plaintiffs disclosed their agreement under which Green Fresh was to act as exporter of record for Gerber's merchandise, and with the agreement itself. The findings of fact the agency relied upon to support its invoking "total adverse facts available" pertained to the disclosures of the terms of the agreement in questionnaire responses by the two plaintiffs. These findings were factually unrelated to the issue of government control. Commerce neither cited record evidence showing that, nor made a finding of fact that, either plaintiff was subject to the control of the PRC government. As noted previously, Commerce made, and maintained through the review, an actual finding of fact that both Green Fresh and Gerber were *not* subject to government control. Consistent with the decision of the Court of Appeals in *De Cecco* and this Court's decision in *Shandong Huarong*, the court concludes that the determination set forth in the *Final Results* to apply the 198.63 percent assessment rate to the shipments of Gerber and Green Fresh was not supported by substantial evidence and, accordingly, was contrary to law.

The legislative history of 19 U.S.C. § 1677e(b) further illustrates that Commerce's action in the *Final Results* is based on an impermissible use of the authority thereunder. Subsection (b) of § 1677e "permits Commerce and the Commission to draw an adverse inference where a party has not cooperated in a proceeding," by "not act[ing] to the best of its ability to comply with

requests for necessary information." *SAA* at 870, *as reprinted in* 1994 U.S.C.C.A.N. at 4199.

The Statement of Administrative Action makes clear that Commerce may not be indiscriminate

in drawing an adverse inference. "Where a party has not cooperated, Commerce and the

Commission may employ adverse inferences *about the missing information* to ensure that the

party does not obtain a more favorable result by failing to cooperate than if it had cooperated

fully." *Id.* (emphasis added). Because Commerce is empowered to use adverse inferences only

in "selecting from among the facts otherwise available," it may *not* do so in disregard of

information of record that is not missing or otherwise deficient under subsection (a). *See*

19 U.S.C. § 1677e(b).

In summary, Commerce erred in applying § 1677e(b) by determining that the PRC-wide

rate should apply to Gerber and Green Fresh as "adverse inferences." The choice of the

PRC-wide rate, which Commerce based solely on the existence of the export agency agreement

and the way Gerber and Green Fresh had reported that agreement, bore no relationship to record

evidence needed to calculate actual antidumping margins pertaining to shipments of mushrooms

associated with Gerber or Green Fresh during the period of review. Commerce does not attempt

to establish such a relationship. Instead, contrary to § 1677e(b), Commerce assigned the PRC-

wide rate to Gerber and Green Fresh to punish them for the existence of the export agency

agreement and the manner in which the parties reported it. In this respect as well as the

inconsistency with Commerce's findings of fact on the absence of government control, the

determination to apply the 198.63 percent assessment rate to the merchandise produced by both

plaintiffs was not supported by substantial evidence.

C. Commerce's Choice of the PRC-Wide Assessment Rate Cannot Be Justified by Deference to Commerce's Construction of Either 19 U.S.C. § 1677e or the Antidumping Laws Generally

This court cannot agree with defendant's argument that the principle of deference established by *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. at 837, requires the court to uphold Commerce's decision to assign a 198.63 percent antidumping duty assessment rate to the two plaintiffs. According to defendant, that decision must be upheld as an exercise of Commerce's authority to interpret 19 U.S.C. § 1677e or the antidumping laws generally.

Commerce's interpretations of the statute it is charged with administering, whether adopted pursuant to a rulemaking or adjudicative proceeding, are accorded deference consistent with the Supreme Court's decision in *Chevron*. *See Chevron*, 467 U.S. at 842-43; *see also Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1379-82 (Fed. Cir. 2001). As directed by the Supreme Court in *Chevron*, the court first must consider "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43. If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id*. at 843. In the absence of specific findings of fact required under § 1677e and the related provisions under § 1677m, no permissible construction of § 1677e and provisions related thereto could allow Commerce to impose the 198.63 percent assessment rate on the mushroom shipments associated with Gerber and Green Fresh. Although Congress provided Commerce considerable discretion in 19 U.S.C. § 1677e, Congress, in that and related statutory provisions, has spoken directly to the issue of

what findings of fact are necessary to invoke the procedure thereunder. In this case, Commerce did not make all the necessary findings of fact, and significant findings of fact that Commerce did make must be set aside because Commerce failed to support them with substantial evidence on the record.

Defendant and defendant-intervenor make an additional argument that, aside from 19 U.S.C. § 1677e, Commerce's adoption of the PRC-wide assessment rate was justified by Commerce's "inherent authority" to address circumvention of the antidumping laws. Defendant and defendant-intervenor fail to cite a specific statutory provision that conceivably could be construed (reasonably or otherwise) to support this claim of inherent authority. Nor is the court aware of any such provision.

Defendant cites to a number of cases before this Court and the Court of Appeals for the Federal Circuit in support of its claim of "inherent authority," but none of those cases holds, or even suggests, that action of the kind resorted to in this case is a proper exercise of Commerce's discretion. For example, Commerce cites *Tung Mung Development Co. v. United States*, 26 CIT 969, 979-81, 219 F. Supp. 2d 1333, 1343-44 (2002), where the Court deferred to Commerce's interpretation of the relevant antidumping provisions, thereby permitting Commerce to choose an appropriate methodology for computing dumping for transactions involving middlemen. Commerce also cites *Mitsubishi Electric Corp. v. United States*, 12 CIT 1025, 1046, 700 F. Supp. 538, 555 (1988), where the Court deferred to Commerce's discretion to define the scope of an investigation to capture all forms of the subject merchandise. Although Commerce has certain discretion to interpret ambiguous statutory provisions with the purpose of preventing evasion of antidumping duties, in this case, Commerce is invoking inherent authority in an

attempt to police the cash deposit requirement through the imposition of an extraordinarily high antidumping duty assessment rate.

Commerce also relies on a recent decision of this Court to argue that Commerce's inherent authority permits it to apply adverse inferences as it has done in the *Final Results*. Commerce cites *Elkem Metals Co. v. United States*, 27 CIT __, __, 276 F. Supp. 2d 1296, 1303 (2003), where the Court upheld the International Trade Commission's application of best information available to domestic producers who concealed a price-fixing arrangement during a material injury investigation. While both *Elkem Metals* and this case involve a contractual agreement, the agreement in *Elkem Metals* involved price-fixing by domestic producers. In a material injury investigation, price-fixing directly affects the International Trade Commission's determination of whether material injury exists or whether a threat of material injury exists. In this case, however, Commerce has not established how its findings regarding the terms of the export agency agreement affect the information necessary to calculate antidumping duty assessment rates. To the contrary, Commerce found that the information subsequently revealed regarding the export agency agreement did not compromise Commerce's ability to calculate individual antidumping duty assessment rates. *Cash Deposit Memorandum* at 6.

Applying the PRC-wide rate as "total adverse facts available" based on the applicable record of this administrative review required Commerce to ignore evidence on the record unfavorable to its desired outcome and to act in the absence of required findings of fact. As the Court of Appeals explained, Commerce may consider deterrence when invoking adverse inferences to choose a dumping margin, but it may do so only "so long as the rate chosen has a relationship to the actual sales information available." *Ta Chen Stainless Steel Pipe, Inc.*, 298 F.3d at 1340. Commerce's invoking its "inherent authority" does not justify the exercise of a

statutory power in a manner contrary to Congress's clearly expressed intent. As the Court of Appeals stated, "Congress could not have intended for Commerce's discretion to include the ability to select unreasonably high rates with no relationship to the respondent's actual dumping margin." *Id.* (quoting *De Cecco*, 216 F.3d at 1032). Neither the "adverse inferences" provision of 19 U.S.C. § 1677e(b) nor the general authority granted by the antidumping laws empowers Commerce to assign punitive antidumping duty assessment rates that are unsupported by record evidence and contrary to facts Commerce found in its own review proceeding.

## IV. CONCLUSION

The court concludes that Commerce's determination in the *Final Results* to select and apply the 198.63 percent assessment rate to both plaintiffs as "facts otherwise available" and "adverse inferences" is not supported by substantial evidence on the record and is otherwise not in accordance with law. Therefore, plaintiff's motion for judgment on the agency record must be granted.

On remand, Commerce must calculate individual antidumping duty assessment rates for Gerber and Green Fresh in accordance with applicable statutory requirements.[5] These individual assessment rates must be consistent with the findings of fact made by Commerce that each of the two plaintiffs is free of government control.

---

[5] Commerce, in the *Final Results*, also applied the 198.63 percent rate as the new cash deposit rate for both plaintiffs. Because assessment rates have not been determined pursuant to a final judgment, the court will not direct any action to be taken with regard to cash deposits. *See Inland Steel Bar Co. v. United States*, 18 CIT 14, 843 F. Supp. 1477 (1994) (holding that party was not entitled to a revised cash deposit rate or refund of previous deposits where final judgment had not been entered with respect to the cash deposit rate). In this litigation, moreover, the determination of the assessment rates on remand likely will moot any issues involving cash deposits.

If Commerce relies on its authority under 19 U.S.C. § 1677e in calculating individual assessment rates, then it must identify what information needed to calculate those assessment rates is unavailable or is deficient according to the statutory requirements for submitted information, including in particular the requirements of 19 U.S.C. § 1677m(e), so as to require the use of the "facts otherwise available" procedure of 19 U.S.C. § 1677e(a). If Commerce determines that any information that was submitted by either plaintiff and is necessary to the calculation of the individual assessment rates is unverifiable, then it must identify that specific information and provide a reasoned and supported analysis of any decision to deem that specific information unverifiable.

If Commerce relies on its authority under 19 U.S.C. § 1677e(a) in calculating an individual assessment rate for either plaintiff, and also, pursuant to 19 U.S.C. § 1677e(b), uses any inferences adverse to either plaintiff in selecting from among the facts otherwise available, Commerce must explain its conclusion, based on substantial evidence on the record, that the party in question failed to cooperate to the best of its ability in providing information that was needed to calculate the individual assessment rate. In that event, Commerce must include in the remand determination its findings of fact and a reasoned analysis supporting its conclusions.

If Commerce does not identify substantial evidence to support the rejection of any of plaintiffs' data that was used to calculate the rates in the *Preliminary Results*, then Commerce must assign Gerber and Green Fresh the assessment rates stated in the *Preliminary Results* or explain with reasoned and supported analysis in the remand determination why assessment rates different from those rates are appropriate for adoption as final assessment rates.

<u>**O**RDER</u>

For the reasons stated in this Opinion and Order, plaintiff's motion for judgment on the agency record is granted, and it is hereby

**ORDERED** that this matter is remanded for further administrative proceedings consistent with this Opinion and Order; and it is further

**ORDERED** that the Department of Commerce may reopen the administrative record if it deems it necessary to do so to allow plaintiffs to submit information required for the calculation, pursuant to 19 U.S.C. § 1675(a), of individual antidumping duty assessment rates for each of the plaintiffs; and it is further

**ORDERED** that the Department of Commerce shall have ninety (90) days from the date of this order to complete and file its remand determination; plaintiffs shall have thirty (30) days from that filing to file comments; and Commerce and defendant-intervenor shall have twenty (20) days after plaintiffs' comments are filed to file any reply.

/s/ Timothy C. Stanceu
Timothy C. Stanceu
Judge

Dated: July 18, 2005
       New York, New York